**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Benjamin RUGGIERO, Nicholas Santora, Anthony Rabito, and Antonio Tomasulo, Defendants-Appellants.**

Nos. 1158, 1362, 1168 and 1363, Docket 82–1395, 82–1396, 82–1398 and 82–1399.

United States Court of Appeals, Second Circuit.

Argued April 26, 1983.

Final Briefs Submitted Nov. 3, 1983.

Decided Jan. 18, 1984.

See also, D.C., 564 F.Supp. 951.

Barbara S. Jones, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Gerard E. Lynch, New York City, of counsel), for plaintiff-appellee.

Robert Koppelman, (Edward M. Chikofsky, Russo Silverman & Vitaliano, of counsel) New York City, for defendant-appellant Ruggiero.

Frank A. Lopez, Brooklyn, N.Y. (Meyer & Light, Brooklyn, N.Y., of counsel), for defendant-appellant Santora.

Paul Rao, Jr., New York City, for defendant-appellant Rabito.

Irwin Klein, New York City, for defendant-appellant Tomasulo.

Before NEWMAN and PRATT, Circuit Judges, METZNER, District Judge.[*]

GEORGE C. PRATT, Circuit Judge:

Appellants Benjamin Ruggiero, Nicholas Santora, Antonio Tomasulo, and Anthony Rabito appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, after a six-week jury trial before Hon. Robert W. Sweet. Their indictment and convictions resulted from a six-year investigation into the Bonanno organized crime family that had uncovered evidence of a wide range of criminal activities, including murder, gambling, narcotics distribution, and armed robbery.

The indictment charged ten defendants in various combinations under four counts. Count One charged a RICO conspiracy under 18 U.S.C. § 1962(d) (1982), part of the Racketeer Influenced and Corrupt Organizations Act. It alleged that all ten defendants had conspired to participate in the affairs of an enterprise, the Bonanno organized crime family, through a pattern of racketeering activity in violation of § 1962(c). The alleged pattern of racketeering activity consisted of 13 separate conspiracies to violate various state and federal laws involving the defendants in various combinations. They were charged with conspiring to murder, to receive stolen goods, to steal goods in interstate commerce, to rob various people, to distribute methaqualone, and to run an illegal gambling business. Count Two charged the appellants, together with John Cerasani and Vincent Piteo, with a substantive RICO violation under § 1962(c). The alleged pattern of racketeering consisted of the substantive crimes which were the subjects of nine of the predicate conspiracies charged under Count One. Counts Three and Four charged appellants Rabito and Santora, together with James Episcopia, with substantive and conspiracy offenses of possessing and distributing methaqualone under 21 U.S.C. §§ 841 and 846 (1982).

Five of the defendants named in the indictment were not tried. Piteo pled guilty to reduced charges before trial, and his conviction is being affirmed by a simultaneously filed opinion. Episcopia's trial was severed. The government entered an order of *nolle prosequi* against Dennis Mulligan. Joseph Messina and Dominick "Sonny Black" Napolitano did not appear for trial, and the New York City Police Department subsequently confirmed that Napolitano had been murdered.

At trial Cerasani was acquitted on all counts. Appellant Ruggiero was convicted of the RICO conspiracy and acquitted of the RICO substantive charge. Appellant Santora was convicted of both RICO charges and the narcotics conspiracy, but acquitted on the narcotics substantive count. Appellant Rabito was acquitted on the RICO conspiracy, but convicted on both narcotics counts. Appellant Tomasulo was convicted of the RICO conspiracy. Thus, on the RICO conspiracy count the jury convicted Ruggiero, Santora, and Tomasulo; on the RICO substantive count it convicted only Santora; on the narcotics conspiracy count it convicted Santora and Rabito; and on the narcotics substantive count it convicted only Rabito.

---

[*] District Judge of the Southern District of New York, sitting by designation.

This appeal focuses primarily on two issues involving predicate acts for the RICO conspiracy count. The first issue is whether in a RICO conspiracy prosecuted under 18 U.S.C. § 1962(d) it is permissible for the government to use a conspiracy to commit murder as one of the predicate acts of racketeering activity. We hold that it is. The other issue is whether it is permissible similarly to use a conspiracy to conduct an illegal gambling operation in violation of 18 U.S.C. § 1955. We hold that it is not. There is no merit to any of the other individual or collective claims of error.

## I. FACTS

### A. *The Undercover Operations*

Beginning in 1976, special agent Joseph Pistone of the FBI began an undercover assignment to infiltrate "fences"—persons who receive stolen goods—associated with organized crime in New York City. Using the name "Donnie Brasco", Pistone assumed the identity of a burglar and jewel thief. In this undercover role, Pistone met appellant Ruggiero, who was affiliated with the Bonnano crime family. Pistone placed bets with and helped Ruggiero make collections for a bookmaking operation run by Ruggiero out of his social club in lower Manhattan. In 1977 Ruggiero confided to Pistone that he had become a "made" member of the Bonnano organized crime family of La Cosa Nostra. He later introduced agent Pistone to various members of the Bonnano family, who were engaged in a variety of criminal activities, primarily in New York City and Tampa, Florida.

Pistone learned that the boss of the family was Carmine Galante, later succeeded by Philip "Rusty" Rastelli, and that the family was organized into five divisions or "crews", each of which was headed by a captain. Ruggiero was a member of Mike Sabella's crew, later captained by codefendant Napolitano. Although transferred by the FBI out of New York in January of 1978, Pistone still kept in frequent contact with Ruggiero.

Meanwhile, FBI agent Edgar Robb assumed an undercover identity in an unrelated investigation in Florida. Using the name "Tony Rossi", Robb, along with other agents, opened the "King's Court Bottle Club" in Holiday, Florida to obtain evidence of criminal activity there.

In March 1980, at agent Pistone's suggestion, Ruggiero met agent Robb at the King's Court, ostensibly to enable Robb to seek Ruggiero's assistance in expanding his operations, and to reduce pressure from other organized crime members. Ruggiero agreed to help and to provide agent Robb "peace of mind"—in exchange for $3,000 plus $250 a week.

In April 1980, Ruggiero returned to the King's Court with Napolitano, who had replaced Sabella as Ruggiero's captain. Napolitano ordered agents Pistone and Robb to become involved in loan sharking and bookmaking on his behalf.

Napolitano operated his crew from a social club on Graham Avenue in Brooklyn, called the Motion Lounge, where Pistone on several visits met various members of Napolitano's crew, including codefendants Santora, Cerasani, and Tomasulo. Tomasulo ran a bookmaking operation from the Capri Car Service, located diagonally across the street from the Motion Lounge.

### B. *Electronic Surveillance and Other Investigatory Techniques*

The government made extensive use of electronic surveillance during the course of its investigations. Agent Pistone was "wired" with a transmitter during many of the encounters he had with the defendants. The government also placed a series of authorized wiretaps on the telephones of appellants Rabito, Napolitano, Tomasulo, and Ruggiero. In addition, FBI surveillance followed Rabito and photographed him on occasion.

### C. *The Conspiracies to Murder*

Through Ruggiero, agent Pistone learned that in 1981 the five Bonnano captains, Napolitano, Joseph Messina, Philip Giaccone, Alphonse Indelicato, and Dominick Trinchera, were embroiled in a dispute over

control of the family. Napolitano and Messina remained loyal to Rastelli, who was in prison; aligned against them were Giaccone, Indelicato, and Trinchera, who sought to wrest control of the family from Rastelli.

On May 5, 1981, the three rebel captains were lured to a meeting and murdered. Indelicato's body was discovered in a vacant lot in Queens, but the bodies of Giaccone and Trinchera were never found. The evidence did not conclusively establish who actually was responsible for the murders, but Napolitano, Ruggiero, Rabito, and Messina were all strongly implicated.

For instance, agent Pistone had tried to reach Ruggiero by telephone on May 5, 1981, the day of the murders, but was unable to do so. Three days later FBI surveillance identified Ruggiero leaving Rabito's apartment with two other men, all carrying suitcases, and they all drove away in a car registered to Santora. That same day, May 8, 1981, agent Pistone spoke to Ruggiero in a taped conversation. Ruggiero explained that he had "come in" because his wife had not packed him enough clothes, and then told Pistone that he would be gone "awhile yet", but proclaimed that "everything is fine, we're winners", and that a "lot of punks ran away—but—they came back—we gave them sanctuary." He added, there was "one more situation" they had to take care of. On another occasion Ruggiero stated that he, Santora and two others were at the "hit". He also complained that Messina was supposed to take care of Indelicato's body but had "screwed it up". In addition, both Ruggiero and Santora described details of the shooting of Trinchera.

On May 12, 1981, Ruggiero told agent Pistone that Napolitano wanted to see him in New York. At the meeting Napolitano told Pistone, "we took care of those three guys, they're gone", but that Indelicato's son, Anthony "Bruno" Indelicato, got away. Napolitano then told agent Pistone that Bruno might have gone to Florida, and he ordered Pistone to hit Bruno if he found him.

### D. The Narcotics Distribution

#### 1. In the Southern District

Conversations intercepted from wiretaps on defendant Rabito's phone indicated that Rabito was involved in the distribution of quaaludes in the Southern District of New York. The conversations indicated that, from May 28, 1981 through July 9, 1981, Rabito had negotiated for the purchase of quaaludes from a source named George Gulla, and then arranged for the sale of those pills to his own regular customers. FBI surveillance of Rabito, supplemented with photographs, corroborated the various meetings arranged over the telephone.

#### 2. In the Eastern District

While in New York on May 15, 1981, agent Pistone arranged with Napolitano and Cerasani to purchase quaaludes for redistribution in Florida. After Pistone had asked Napolitano for samples of quaaludes, Santora and Cerasani gave Pistone samples at Tomasulo's Capri Car Service. A week later Ruggiero discussed the quality and price of the pills with agent Pistone and told Pistone to let him know when Pistone was ready for a large sale. The government later intercepted a conversation between Tomasulo and an individual named "Rocky" in which Rocky asked Tomasulo for 2,000 quaaludes.

### E. The Gambling Operations

On visits to New York, agents Robb and Pistone often saw Tomasulo and Santora in the Motion Lounge with other members of Napolitano's crew. On one visit, Pistone brought $2,500—at Napolitano's request—to cover losses from Napolitano's bookmaking operation. Napolitano introduced Tomasulo to agent Pistone as his partner in the numbers operation. Government informant Raymond Wean, who was a member of Messina's crew, testified that he had seen Tomasulo reviewing numbers bets with Santora and Cerasani on several occasions. Expert witnesses concluded, after analyzing over 150 intercepted conversations, that Santora and Tomasulo were involved in a numbers operation.

F. *Additional Crimes*

The government also introduced evidence to show that members of various Bonanno family crews were engaged in other criminal activities, such as an attempted robbery of an apartment belonging to the Shah of Iran's family, and a truck theft.

## II. DISCUSSION

A. *Conspiracy as a Predicate Act—In General*

Appellants Ruggiero, Santora, and Tomasulo raise several issues directed at Count One of the indictment, the RICO conspiracy. One of those issues, whether a conspiracy may serve as a predicate act for a RICO conspiracy charge under 18 U.S.C. § 1962(d), has not previously been determined in this circuit.

Count One of the indictment charged them and seven other defendants with violating § 1962(d) by conspiring to participate in the affairs of a criminal enterprise, "the Bonanno Family of La Cosa Nostra", through a pattern of racketeering activity that included 13 different crimes, all of them conspiracies. In order to satisfy the statutory definition of a "pattern of racketeering activity", 18 U.S.C. § 1961(5), each defendant was charged with at least two predicate acts.

For example, Ruggiero was charged with four conspiracies to murder in violation of N.Y.Penal Law §§ 125.25 and 105.15 (McKinney 1975), and one conspiracy to distribute quaaludes in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 846. Santora was charged with the same predicate acts plus a conspiracy to distribute quaaludes in violation of the same federal statutes and a conspiracy to direct and own an illegal gambling business in violation of 18 U.S.C. § 1955. Tomasulo was charged with only two predicate conspiracies: one to distribute quaaludes, and the other to conduct an illegal gambling operation.

These appellants contend that a conspiracy may never serve as a predicate act of racketeering activity for a RICO conspiracy charge under 18 U.S.C. § 1962(d), but none

of their supporting arguments has merit. "Racketeering activity" was expressly defined by Congress as including four groups of crimes. Group (A) includes "any act or threat involving murder" and a variety of other crimes, provided it is "chargeable under State law and punishable by imprisonment for more than one year". Group (B) includes "any act which is indictable under any of" 33 enumerated sections of Title 18 of the United States Code. Group (C) includes "any act which is indictable under" § 186 or § 501(c) of Title 29 of the United States Code. Group (D) includes "any offense involving" bankruptcy fraud, securities fraud, or drugs that is "punishable under any law of the United States." 18 U.S.C. § 1961(1).

In *United States v. Weisman*, 624 F.2d 1118 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), we held "that conspiracy can properly be charged as a predicate act of racketeering under RICO, at least when it involves any of the substantive offenses listed in [group (D)]." 624 F.2d at 1123. In reaching that conclusion we viewed the phrase "any offense involving", found in § 1961(1)(D), as "certainly broad enough on its face to include *conspiracies* involving securities and bankruptcy fraud and drug related offenses." *Id.* at 1124 (emphasis added). We noted that, although Congress had deleted the term "conspiracy" from earlier drafts of the RICO statute, in the final version it nevertheless retained in subsection (D) the expansive language "any offense involving", while it conspicuously omitted that language from subsections (B) and (C), which require that the racketeering act "be indictable under specifically enumerated sections of the [federal] criminal code." *Id.*

■ Our holding in *Weisman* directly controls the conspiracy to distribute quaaludes charged as a predicate act against Ruggiero, Santora, and Tomasulo. Moreover, the sound reasoning behind Chief Judge Feinberg's opinion in *Weisman* confirms Congress's intention that a conspiracy to violate state law can be a predicate act under subsection (A). Just as subsection

(D)'s phrase "any offense involving" was broad enough in *Weisman* to include a conspiracy to commit bankruptcy fraud, securities fraud, or narcotics violations, so is subsection (A)'s phrase, *"any act or threat involving* murder, \* \* \*, gambling, \* \* \* which is *chargeable* under State law *and punishable* by imprisonment for more than one year" (emphasis supplied), broad enough to include a conspiracy to commit any one of those state law crimes. *See United States v. Welch,* 656 F.2d 1039, 1063 n. 32 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982).

## B. *Conspiracies to Murder*

Turning our attention specifically to the conspiracies to murder charged as predicate acts committed by Ruggiero and Santora, we focus more sharply on the language of the statute. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Appellants were convicted of violating § 1962(d), which provides:

It shall be unlawful for any person to conspire to violate [subsection (c) ] of this section.

Subsection (c), in turn, provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity \* \* \*.

"Pattern of racketeering activity" is defined under 18 U.S.C. § 1961(5). It requires among other things "at least two acts of racketeering activity". Section 1961(1) defines "racketeering activity" to mean "any act or threat involving murder, \* \* \*, which is chargeable under State law and punishable by imprisonment for more than one year".

▮ In the context of the subject indictment, therefore, the issue with respect to Ruggiero and Santora is whether a conspiracy to commit murder is an "act or threat involving murder \* \* \* which is chargeable

under State law". Guided by Congress's expressed intention that the RICO statute "shall be liberally construed to effectuate its remedial purposes", Pub.L. No. 91–452, § 904(a), 84 Stat. 947 (codified at 18 U.S.C. § 1961 (note)), we conclude that a conspiracy to murder in violation of New York's Penal Law §§ 125.25 and 105.15 is an "act involving" murder and therefore may constitute "racketeering activity" within the meaning of the RICO statute.

The indictment alleges that all four of the murder conspiracies were committed in violation of particular sections of New York's Penal Law. Section 125.25 proscribes murder in the second degree and classifies it as a Class A–1 felony which is punishable by life imprisonment under N.Y. Penal Law § 70.00(2)(a) (McKinney 1975). Section 105.15 proscribes conspiracy to engage in conduct constituting a Class A felony, and classifies the conspiracy as a Class B felony which is punishable by imprisonment up to 25 years under N.Y.Penal Law § 70.00(2)(b). Thus, as acts "involving" murder, which are felonies under New York state law, the four conspiracies to commit murder charged as predicate acts in the indictment constitute acts of "racketeering activity" within the meaning of the RICO statute.

## C. *Gambling Conspiracy*

▮ In contrast, the gambling conspiracy charged as a predicate act in paragraph 5m of Count One cannot serve as an act of "racketeering activity" under the definitions set forth in 18 U.S.C. § 1961(1). The indictment charged that Santora, Tomasulo, and others conspired "to direct and own an illegal gambling business, to wit, a sports and numbers betting business, in violation of the laws of the State of New York, which business involved five or more persons and remained in substantially continuous operation for in excess of thirty (30) days in violation of Title 18 U.S.C. § 1955."

Section 1955, allegedly violated by the gambling conspiracy, is one of the sections included in Group (B) of the statutory defi-

nitions contained in § 1961(2). However, to constitute a predicate act under Group (B), the offensive conduct must be an "act which is indictable under" the named section, here § 1955, which proscribes the substantive offense of conducting an illegal gambling business, but not a conspiracy to conduct one. Thus, a conspiracy to violate § 1955 is not an act of racketeering activity under the definitions in 18 U.S.C. § 1961.

As an alternative argument to save predicate act 5m of Count One, the government suggests that its allegation of a conspiracy to violate § 1955 is surplusage that can be disregarded because if the indictment had alleged instead a substantive violation of § 1955 the charge then would have been sufficient. We do not think that the difference between a substantive gambling crime under § 1955 and a conspiracy to violate § 1955, which under federal law could be charged only under 18 U.S.C. § 371 (1982), can be so readily put aside.

First, the entire structure of paragraph 5 of Count One, setting forth in each subparagraph a different conspiracy, alerts defendants that the predicate acts they must defend against are conspiracies, not substantive crimes. Second, the contrast of Count Two, which sets forth only substantive crimes, reinforces the impression created by the allegations of Count One. Third, the fact that some defendants were charged in Count One and not in Count Two throws into bold relief the contrast between the conspiracy predicate acts alleged in Count One, and the substantive predicate acts alleged in Count Two. Finally, the proof of a conspiracy to violate the gambling law as a predicate act under Count One is not identical with the proof required to establish a substantive violation of § 1955 as a predicate act. We cannot, therefore, simply disregard as mere surplusage the conspiracy allegation of predicate act 5m. Since the government alleged a conspiracy to violate § 1955, and since the trial court charged such a conspiracy to the jury, we must review the case as including such a conspiracy.

Finally on this point, the government argues that the conspiracy alleged in paragraph 5m falls under Group A as a conspiracy to violate state law rather than under Group B as an offense indictable under 18 U.S.C. § 1955. This argument, too, must fail. In the first place, it contradicts the language of the indictment. Second, in submitting this act of racketeering to the jury, the court charged in detail the essential elements of a gambling offense under 18 U.S.C. § 1955. Although the court did refer to the general definitions of "bookmaking", "policy", and "the numbers game" as set forth in New York's Penal Law § 225.00, its instruction was not sufficient to submit the gambling conspiracy as a state offense under Group (A), because the court did not charge the essential elements of a felony under New York's gambling statutes. Article 225 of New York's Penal Law creates five gambling offenses, only two of which, §§ 225.10 and 225.20, are felonies. The other three, §§ 225.05, 225.-15, and 225.30, are misdemeanors. To qualify as a predicate act under Group A the offending conduct must be not only "chargeable under State law" but also "punishable by imprisonment for more than one year". By way of comparison to violate the federal gambling statute, the government need prove only that the gambling business conducted "is a *violation* of the law of a State or political subdivision in which it is conducted". 18 U.S.C. § 1955(b)(1)(i) (emphasis added). Thus, any gambling violation under state law, whatever its classification, may support a federal prosecution under § 1955; but to constitute a Group A predicate act, a state gambling charge would have to include those elements which make the chargeable offense punishable by more than one year in prison.

Since neither the indictment nor the court's charge to the jury set forth those additional factors for the jury's consideration, predicate act 5m may not be construed as a conspiracy to violate state gambling laws. As submitted to the jury, therefore, the thirteenth predicate act, conspiracy to direct and own an illegal gambling business,

does not qualify as an act of racketeering activity under RICO.

### D. *Disposition of Count One (RICO Conspiracy)*

We concluded earlier that just as a conspiracy to commit bankruptcy fraud, securities fraud, or a drug offense qualifies as a RICO predicate act under Group D, 18 U.S.C. § 1961(1)(D), so does a conspiracy to commit murder qualify as a RICO predicate act under Group A, § 1961(1)(A). This conclusion requires affirmance of the conviction of Ruggiero under Count One, because his predicate acts were conspiracies to murder, together with one drug conspiracy that is not in issue here. On the other hand, we have also concluded that a conspiracy to promote gambling in violation of 18 U.S.C. § 1955 does not qualify as a RICO predicate act, so we must examine the impact of that conclusion on the convictions of Tomasulo and Santora.

#### 1. *Tomasulo*

■ Tomasulo was charged with only two predicate acts, one of which was the legally insufficient gambling conspiracy. Without the gambling predicate act, the charge against Tomasulo must be dismissed because it does not satisfy the statute's requirement that a "pattern of racketeering" consist of at least two acts of racketeering. 18 U.S.C. § 1961(5).

The government argues that no predicate acts are necessary for a RICO conspiracy charge against Tomasulo, and that it is sufficient that Tomasulo was found to have conspired with others to engage through an enterprise in a pattern of racketeering consisting of predicate acts committed by others. We are reluctant to accept this extremely broad interpretation of RICO in the absence of controlling authority. Prevailing case law requires that for the government to convict on a RICO conspiracy it must prove that defendant himself at least agreed to commit two or more predicate crimes. *United States v. Bagaric,* 706 F.2d 42, 62 (2d Cir.1983); *United States v. Brooklier,* 685 F.2d 1208, 1223 (9th Cir.

1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983); *United States v. Sutherland,* 656 F.2d 1181, 1186–87 (5th Cir. 1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Barton,* 647 F.2d 224, 237 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The trial court so instructed the jury in this case, and we see no reason now to apply a different view. As to Tomasulo, therefore, we reverse and dismiss.

#### 2. *Santora*

■ Santora's situation is different. He was charged in Count One with involvement in eight conspiracies as acts of racketeering activity: four to murder, two to distribute drugs, one to rob, and one to conduct a gambling business. Because the jury was asked to determine only the guilt or innocence of Santora on the RICO conspiracy count, we cannot tell from its verdict on Count One what decisions it made with respect to the eight predicate acts. Its verdict of guilty establishes that Santora had committed at least two of the charged predicate conspiracies. For all we know, the jury may have found he committed more than two, possibly even all eight. However, absent some indication by the jury that its determination of guilt rested on two or more predicate acts that are legally sufficient, we are required to reverse the conviction because the legally insufficient predicate act relating to gambling may have been necessary to the verdict.

To avoid reversal of Santora's RICO conspiracy conviction the government advances three arguments, none of which is persuasive. First, the government contends that because Santora was convicted under Count Two, which set forth six substantive crimes, all of which are legally sufficient predicate acts of racketeering, we can be

satisfied within the principles underlying *United States v. Weisman,* 624 F.2d at 1124, and *United States v. Parness,* 503 F.2d 430, 438 (2d Cir.), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), that Santora did engage in a pattern of racketeering by committing at least two predicate acts. In both *Weisman* and *Parness* this court found that the defendant's convictions on separate substantive counts alleged in the same indictment were sufficient to establish the requisite pattern of racketeering activity for the RICO conviction. In each of those cases, however, the substantive crimes relied on were also alleged in the RICO count as predicate acts of racketeering, so that the court was assured by the separate convictions that the jury had found defendant guilty of committing at least two of the predicate acts alleged in the indictment. We have no such assurance with Santora's conviction, however, because the predicate acts alleged in Count One were all conspiracies, and the predicate acts in Count Two, on which the government would have us rely, were all substantive crimes. In effect, what the government is asking us to do is to amend Count One of the indictment on appeal by changing the predicate acts in that count from the conspiracies alleged and submitted to the jury to the substantive crimes included as predicate acts in Count Two. This we decline to do.

Second, the government contends that because the substantive crimes alleged as predicate acts in Count Two parallel six of the conspiracies alleged in Count One, we can be satisfied that the conspiracy to violate § 1955 alleged in predicate act 5m of Count One was not a necessary part of the jury's verdict. The argument fails, however, because one of the substantive crimes alleged as a predicate act in Count Two was to conduct a gambling business in violation of 18 U.S.C. § 1955. Since we cannot determine otherwise from the jury's verdicts, in fairness to the defendant we assume that the gambling predicate act was necessary to each verdict. While the substantive crime of gambling as a predicate act is sufficient under Count Two, thereby requiring affirmance of Santora's conviction on that count, the conspiracy to gamble under Count One is not sufficient, as we have already indicated.

Third, the government contends that Santora may not avail himself of the legal insufficiency of the gambling conspiracy as a predicate act because he did not move in the trial court to withdraw the defective predicate act from jury consideration. In support, the government relies upon *United States v. Natelli,* 527 F.2d 311 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *United States v. Bonacorsa,* 528 F.2d 1218 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Goldstein,* 168 F.2d 666 (2d Cir.1948); *United States v. Mascuch,* 111 F.2d 602 (2d Cir.), *cert. denied,* 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416 (1940). All of those cases, however, dealt with the sufficiency of the evidence to support one of several specifications in a perjury count. We do not consider them controlling in this situation where we are dealing not with the sufficiency of evidence, but with the legal sufficiency of the charge itself. Similarly, the two additional cases cited by the government, *United States v. Mowad,* 641 F.2d 1067 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981), and *United States v. Dixon,* 536 F.2d 1388 (2d Cir.1976), involving conspiracies alleging several objectives, only one of which was fraud, dealt only with the sufficiency of the evidence. Despite *Dixon's* reference in a dictum to contrary views in two other circuits, 536 F.2d at 1402, neither *Dixon* nor *Mowad* permits a defendant to be convicted of a conspiracy when some of the objectives charged were not crimes.

In short, Santora's conviction on Count One must be reversed. However, unlike Tomasulo, against whom only two predicate acts were alleged, Santora was charged with several other legally sufficient predicate acts. As to him, therefore, a new trial on Count One is ordered, should the government elect to pursue it.

We take this opportunity to alert bench and bar that in a complex RICO trial such as this one, it can be extremely useful for a

trial judge to request the jury to record their specific dispositions of the separate predicate acts charged, in addition to their verdict of guilt or innocence on the RICO charge. *See, e.g., United States v. Walsh,* 700 F.2d 846, 851–52 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Angelilli,* 660 F.2d 23, 30 (2d Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). Then if, as here, a defect affecting a single predicate act is later discovered, an automatic retrial can be avoided whenever the jury's additional determinations indicate that the defendant has been found beyond a reasonable doubt to have committed at least two other of the alleged predicate crimes. While a defendant is not prejudiced by the failure of the trial judge to request separate decisions on the predicate acts, obtaining such decisions in every complex RICO case would greatly facilitate sound management of judicial resources.

D. *Other Issues*

Appellants' other contentions are quickly disposed of.

■ 1. Contrary to appellants' arguments, RICO does apply to illegal, illegitimate enterprises such as the Bonanno crime family, *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and the RICO statute is not unconstitutionally vague, *United States v. Scotto,* 641 F.2d 47 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). As we noted in *United States v. Weisman,* "the present indictment is not rendered invalid simply because some hypothetical prosecutions under the statute as presently interpreted would fall beyond the pale of intended application." 624 F.2d at 1124. Santora does not claim that the statute is vague as applied to him. Indeed, we have no doubt that the conduct for which he was indicted, murder, distributing narcotics, and gambling, all in furtherance of the Bonanno family enterprise, is precisely the type of activity Congress sought to reach through RICO. *United States v. Aleman,* 609 F.2d

298 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

■ 2. Nor does a RICO conspiracy under 18 U.S.C. § 1962(d), supported by predicate acts of racketeering activity that in themselves are conspiracies, violate the principle of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy. *United States v. Elliott,* 571 F.2d at 900–902. A RICO conspiracy under § 1962(d) based on separate conspiracies as predicate offenses is not merely a "conspiracy to conspire" as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO, in this case § 1962(c), which makes it unlawful for any person associated with an interstate enterprise to "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity". *See United States v. Zemek,* 634 F.2d 1159, 1170 n. 15 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). The trial judge clearly instructed the jurors that to find a particular defendant guilty of the RICO conspiracy they would have to find beyond a reasonable doubt that he wilfully participated in at least two of the conspiracies alleged as predicate offenses, that the predicate offenses constituted a pattern of racketeering activity, and that, in addition, the defendant under consideration conspired to participate in the affairs of the Bonanno crime family by engaging in the predicate offenses. The instruction was proper, and the evidence was sufficient to support the defendants' convictions.

3. Santora claims error in the admission against him of coconspirators' statements made to agent Pistone concerning Santora's involvement in the various racketeering acts. Following the requirements of *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), the trial judge found, with substantial evidentiary support, that there was sufficient nonhearsay evidence to establish Santora's member-

ship in the conspiracy and, therefore, to warrant admission under Fed.R.Evid. 801(d)(2)(E) of coconspirators' statements made in furtherance of the conspiracy.

■ 4. More specifically, Santora challenges the admission of Ruggiero's statement to agent Pistone that Santora was present when the three rival captains in the Bonanno family were murdered. Santora argues that this statement was merely a narrative of past activities and therefore was not in furtherance of the conspiracy. We disagree. Other evidence established that Ruggiero considered agent Pistone to be a fellow member of Napolitano's crew in the Bonanno family and that Pistone and Ruggiero were in contact several times each week regarding the affairs of the enterprise. Napolitano had instructed Pistone to "hit" Bruno Indelicato, who had somehow escaped the initial ambush. Under these circumstances we are satisfied that Ruggiero's statement to agent Pistone as to the circumstances surrounding the three murders was made in furtherance of the conspiracy.

■ 5. Ruggiero's attack on the affidavits submitted in support of the applications for the wiretap orders borders on the frivolous. 18 U.S.C. § 2518(1)(c) (1982) requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous". Viewing the affidavits submitted in support of the wiretap applications in a " 'common sense and realistic fashion' ", *United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983); *see United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), and with the deference properly accorded to the issuing judge, *United States v. Perry,* 643 F.2d 38, 50 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *see United States v. Todisco,* 667 F.2d 255, 258 (2d Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982), we find that the affidavits amply satisfy the requirements of the statute.

Unlike the bare conclusions averred in *United States v. Kalustian,* 529 F.2d 585 (9th Cir.1975) and *United States v. Lilla,* 699 F.2d 99 (2d Cir.1983), the cases relied on by Ruggiero, affidavits in the case at bar give specific, detailed reasons why the wiretaps were needed. For instance, the affidavits provide exhaustive detail of the evidence available by "traditional" investigative means, and state the reasons why those techniques were unsatisfactory in this case. Agent Pistone, who operated undercover primarily in Florida, had limited access to the principal subjects of the investigation in New York, and was not privy to information about many of the activities of the enterprise. The affidavits also point out the "inherently secretive structure of the criminal enterprise under investigation", and that the Motion Lounge and the Capri Car Service were in a homogenous neighborhood in Brooklyn where normal surveillance was risky. They further establish that the use of search warrants, investigative grand juries, or interviews would publicize the investigation, compromise the safety of the undercover agents, and perhaps jeopardize the investigation itself. In sum, there is no merit in Ruggiero's challenge to the wiretap orders.

■ 6. Ruggiero was not denied a fair trial by the limitations the trial judge placed on his attempt to show that the FBI had brought false charges against him because he had refused to cooperate with the prosecution. Judge Sweet did permit cross-examination of agent Pistone, the principal witness against Ruggiero, along the lines suggested, but Ruggiero's counsel voluntarily restricted that cross-examination after Judge Sweet alerted him to the possibility that his questioning might open the door to presenting agent Pistone's prior consistent statements.

■ 7. We find no error in Judge Sweet's refusal to permit testimony by the other agents on the same issue. Not only was Ruggiero's offer of proof ephemeral, but the inquiry proposed would have focused on irrelevant issues, would have

opened the door to collateral evidence, and would have further delayed a lengthy trial. In these circumstances the trial court had discretion to exclude the proffered testimony. *See United States v. Corr,* 543 F.2d 1042, 1051 (2d Cir.1976); *see also United States v. Bifield,* 702 F.2d 342, 350 (2d Cir. 1983); *United States v. Pacelli,* 521 F.2d 135, 137 (2d Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *United States v. Clark,* 613 F.2d 391, 407 (2d Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).

■ 8. Ruggiero's claim that he was denied his speedy trial rights under the statute, 18 U.S.C. §§ 3161(b) and 3162(a)(1) (1982), is also without merit. The continuances granted by the district court under 18 U.S.C. § 3161(h)(8)(A) were proper in light of the large volume of evidence, the complexity of the case, and the continuing investigation. *United States v. McGrath,* 613 F.2d 361, 366 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980); *United States v. Rollins,* 487 F.2d 409, 413–14 (2d Cir.1973); *United States v. Cuomo,* 479 F.2d 688, 693–94 (2d Cir.1973).

■ 9. Ruggiero's claim of unconstitutional preindictment delay falls because he failed to show either actual prejudice or unjustifiable governmental conduct, such as deliberate delay to achieve a substantial tactical advantage. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *United States v. Rubin,* 609 F.2d 51, 66 (2d Cir.1979), *aff'd,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

10. Rabito's only separate claim on appeal is that he is entitled to a new trial in the interest of justice because the jury's deliberations were tainted by evidence offered against him on the RICO conspiracy count, on which he was acquitted, and by evidence presented against other defendants on that and other counts of the indictment. Rabito was convicted of drug viola-

tions under Counts Three and Four of the indictment. In his post-trial decision denying Rabito's Rule 33 motion, Judge Sweet carefully evaluated this claim of prejudicial spillover. We agree with his analysis and find no need to repeat it here.

### III. CONCLUSION

The judgment against Antonio Tomasulo on Count One is reversed, and the case against him is remanded with a direction to dismiss that count of the indictment. The judgment against Nicholas Santora on Count One is reversed, and the case against him on that count is remanded for a new trial. In all other respects the judgments appealed from are affirmed.

JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part:

Except for the reversal of Santora's conviction on Count One, see Part II, *infra,* I concur in Judge Pratt's thorough opinion for the Court and write separately primarily to discuss his suggestion that in complex RICO trials it would be useful to put special interrogatories to the jury to ascertain which predicate acts the jurors find to have been proven.

### I. Jury Interrogatories in Criminal Cases

Without doubt the use of jury interrogatories is a practical way of avoiding a retrial in the class of RICO cases, of which this is one, where a legally insufficient predicate act has been submitted to a jury but two or more valid acts, adequate to support a guilty verdict, can be established. An interrogatory eliciting "yes" responses as to two or more valid predicate acts would permit affirmance in such a case, so long as the jury, by a general verdict of guilty, found that all of the elements of the offense charged has been proven beyond a reasonable doubt. What is less certain is whether we may authorize even such a limited use of jury interrogatories in criminal cases.

There is no counterpart in the Federal Rules of Criminal Procedure to the general authority contained in Rule 49(b) of the

Federal Rules of Civil Procedure to have a jury respond to interrogatories when returning a general verdict.[1] Arguably, the absence of such general authority for interrogatories in criminal cases together with the specific requirement for special verdicts in Fed.R.Crim.P. 31(e) applicable only to criminal forfeiture cases, see United States v. Huber, 603 F.2d 387, 396 (2d Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), and the specific requirement for findings in non-jury criminal cases, Fed.R.Crim.P. 23(c), all suggest that interrogatories are not to be used in criminal cases. However, there is lacking in the history of Fed.R.Crim.P. 31 any indication that interrogatories were intended to be prohibited in jury cases, cf. United States v. Pachay, 711 F.2d 488, 490 (2d Cir.1983) (evidence of intent to prohibit waiver of jury unanimity), and the fact that special jury fact-finding is required in criminal forfeiture cases does not mean that is not permissible in other criminal cases. Moreover, Fed.R.Crim.P. 57(b) provides that in the absence of a procedure specified by rule, the court may proceed "in any lawful manner not inconsistent with these rules or with any applicable statute."

Some case law has disfavored jury interrogatories in criminal cases, see, e.g., Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953) (questioning the practice); United States v. Bosch, 505 F.2d 78 (5th Cir.1974) (conviction reversed because interrogatories used); United States v. Spock, 416 F.2d 165 (1st Cir.1969) (same); Gray v. United States, 174 F.2d 919 (8th Cir.) (same), cert. denied, 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949), see also United States v. Jackson, 542 F.2d 403, 412–13 (7th Cir.1976) (approving rejection of defendant's request for interrogatory on insanity defense), though support for the practice has been expressed, Fuller v. United States, 407 F.2d 1199, 1221, 1231 n. 47 (D.C.Cir.1968) (en banc), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125

(1969). However, the selective use of interrogatories has been approved in criminal cases, most pertinently in United States v. Palmeri, 630 F.2d 192, 202–03 (3d Cir.1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981), where the jury was asked to indicate which of 46 predicate acts were proven in a multi-defendant RICO case, and in other cases when necessary to establish a fact crucial to sentencing or an overt act constitutionally required for the offense of treason. See cases collected in United States v. Spock, supra, 416 F.2d at 182 n. 41.

In this Circuit, the practice has evoked differing responses. We expressed general disapproval in United States v. Adcock, 447 F.2d 1337, 1339 (2d Cir.) (per curiam), cert. denied, 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971), though we were there rejecting the prosecution's effort to salvage an invalid conviction by faulting the defendant for failing to request interrogatories. See Skidmore v. Baltimore & Ohio Ry., 167 F.2d 54, 70 (2d Cir.) (L. Hand, J., concurring) (jury particularization "undesirable" in criminal cases), cert. denied, 335 U.S. 816, 69 S.Ct. 34, 93 L.Ed. 371 (1948). See also United States v. Gallishaw, 428 F.2d 760, 765 (2d Cir.1970) (noting the issue, but not resolving it). In United States v. Margiotta, 646 F.2d 729, 733–34 (2d Cir. 1981), cert. denied, —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), we pointed out the permissible use of an interrogatory if requested by a defendant to identify one or more actionable mailings underlying a single mail fraud count. We have also approved an interrogatory when pertinent to sentencing. United States v. Stassi, 544 F.2d 579, 583–84 (2d Cir.1976), cert. denied, 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977). In two cases, as Judge Pratt points out, we have affirmed RICO convictions and noted without comment the use of interrogatories to identify predicate acts, though the practice was not challenged on

---

1. Though the term "special verdict" is sometimes used as the equivalent of a jury interrogatory, "special verdicts," as contemplated by Fed.R.Civ.P. 49(a), are used to elicit precise findings by the jury in the absence of a general verdict, and "interrogatories," contemplated by Fed.R.Civ.P. 49(b), are used in conjunction with a general verdict.

appeal. *United States v. Walsh*, 700 F.2d 846, 851 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Angelilli*, 660 F.2d 23, 30 (2d Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). Also instructive is Judge Palmieri's thoughtful opinion in *United States v. Ogull*, 149 F.Supp. 272 (S.D.N.Y:1957), *aff'd without consideration of this point sub nom. United States v. Gernie*, 252 F.2d 664 (2d Cir.), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958),[2] explaining the need to use an interrogatory to determine whether the defendants' conduct was governed by a recently enacted statute.

Various considerations underlie the opposition to jury interrogatories in criminal cases. There is apprehension that eliciting "yes" or "no" answers to questions concerning the elements of an offense may propel a jury toward a logical conclusion of guilt, whereas a more generalized assessment might have yielded an acquittal.[3] *See United States v. Spock, supra*, 416 F.2d at 182. The possibility also exists that fragmenting a single count into the various ways an offense may be committed affords a divided jury an opportunity to resolve its differences to the defendant's disadvantage by saying "yes" to some means and "no" to others, although unified consideration of the count might have produced an acquittal or at least a hung jury. These concerns apparently influenced the courts in *United States v. James*, 432 F.2d 303 (5th Cir.1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2214, 29 L.Ed.2d 682 (1971) (interrogatory asked jury to identify objects of a conspiracy); *United States v. Spock, supra* (identification of means of committing the offense); *Gray v. United States, supra* (same), although jury identification of objects of a conspiracy has been approved when the defendant consents, *United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir.), *cert. de-*

nied, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976). Interrogatories are especially objectionable when they make resolution of a single fact issue determinative of guilt or innocence, without regard to the elements of an offense, *see United States v. Bosch*, 505 F.2d 78, 80–81 (5th Cir.1974) (existence of promise of immunity), or when their wording shifts the burden of proof to the defendant, *United States v. Wilson*, 629 F.2d 439 (6th Cir.1980) (interrogatory concerning insanity defense). Also of obvious danger, though not considered prejudicial in the circumstances presented, is an interrogatory to be answered only in the event of an acquittal. *See Heald v. Mullaney*, 505 F.2d 1241 (1st Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). In general, those opposing interrogatories fear that any particularization of the jury's decision-making will risk interference with the jury's romantic power of nullification, or as Learned Hand felicitously phrased it, "tempering [the law's] rigor by the mollifying influence of current ethical conventions." *United States ex rel. McCann v. Adams*, 126 F.2d 774, 776 (2d Cir.), *rev'd on other grounds*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Though courts refuse to inform a jury of this prerogative, *United States v. Dougherty*, 473 F.2d 1113, 1130–37 (D.C.Cir.1972); *United States v. Boardman*, 419 F.2d 110, 116 (1st Cir.1969), *cert. denied*, 397 U.S. 991, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970), some condemn interrogatories because they may impair an opportunity the jury is not told it has. *See United States v. Spock, supra*, 416 F.2d at 182.

On balance, I am persuaded that a District Court should have the discretion to use a jury interrogatory in cases where risk of prejudice to the defendant is slight and the advantage of securing particularized fact-finding is substantial. Ascertainment of

---

2. The use of an interrogatory was agreed to by defense counsel in the trial court, *United States v. Ogull, supra*, 149 F.Supp. at 278, and not challenged on appeal.

3. I think it more likely that a jury, generally inclined toward conviction by unflattering evi-

dence about the defendant or by his vague connection with the alleged offense, might be impelled to acquit if obliged to record its determination of the existence of the elements of the offense in cases where the evidence concerning one or more elements is questionable.

predicate acts in a complex RICO trial is an example where the balance tips decidedly in favor of using an interrogatory. The concerns that have prompted disapproval of interrogatories in other contexts are either totally lacking or at best insignificant in this type of case, and such use might avoid the time and cost of a long retrial. I therefore agree that we should join with the Third Circuit in approving the use of an interrogatory to identify proven predicate acts in complex RICO trials. *United States v. Palmeri, supra.*

The procedure to be followed when an interrogatory is used in a criminal trial should be within the discretion of the trial judge. It may be worth considering an instruction to the jury, reflected on the interrogatory form, that the interrogatory concerning specification of predicate acts is to be answered only in the event that the jury has agreed upon a general verdict of guilty. This approach enables the jury to perform its generalized task first, responding to the interrogatory thereafter only if a guilty verdict reflects that the jury has found all the elements of an offense established, including the existence of at least two predicate acts.[4] *See United States v. Ogull, supra,* 149 F.Supp. at 275. Also worth considering, especially in a complicated case, is an instruction that in the event of a conviction the jury should endeavor to answer the interrogatory concerning predicate acts but need not feel obliged to respond as to every alleged act on what might be a long list. *See United States v. Diapulse Manufacturing Corp.,* 389 F.2d 612, 614–15 (2d Cir.) (approving interrogatory that permitted jury to indicate some of the specifications it found established in libel

action for condemnation of misbranded product), *cert. denied,* 392 U.S. 907, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968). And I assume that in every case the trial judge has the discretion not to use an interrogatory at all if persuaded that its use under the circumstances risks prejudice to the defendant.

## II. Santora's Conviction on Count One

The majority reverses Santora's conviction on Count One, charging a RICO conspiracy in violation of 18 U.S.C. § 1962(d) (1982), because of the legal insufficiency of one of the eight predicate acts alleged in that count of the indictment. I agree that predicate act 5m is legally insufficient because the offense there alleged, a conspiracy to violate 18 U.S.C. § 1955 (1982), is not within the definition of "racketeering activity" set forth in section 1961(1). I respectfully dissent, however, from the majority's ruling that the legal insufficiency of predicate act 5m requires reversal of Santora's conviction on Count One.

At trial Santora made no attempt to withdraw predicate act 5m from the jury's consideration.[5] I would hold that his failure to object waived the deficiency of which he now complains.

It is a familiar rule that a conviction must be set aside whenever the jury's verdict rests on alternative bases, one of which is invalid, and it cannot be determined with adequate confidence that the jury relied on the valid basis. *See Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). That rule, however, is usually invoked when the defendant has alerted the trial court to his objection to the submission of the invalid basis to the jury.[6] In the

---

4. I assume that the jury, if it votes to convict, would be instructed to proceed immediately to consideration of the interrogatory, and report both its general verdict and its interrogatory responses simultaneously, rather than seriatim, as the First Circuit has suggested, *United States v. Spock, supra,* 416 F.2d at 183, n. 42.

5. Santora's objection to Count One in its entirety on the ground that conspiracies may not be alleged as predicate acts to a RICO conspiracy charge does not suffice to call the trial judge's attention to a deficiency that concerns only one of the predicate acts. *See United States v.*

*Goldstein,* 168 F.2d 666, 671 (2d Cir.1948) (motion to dismiss a perjury count does not suffice as an objection pertinent to only one of four specifications of perjury).

6. In *Stromberg v. California, supra,* in which the Supreme Court found unconstitutional a state ban on displaying a red flag for one of the three purposes proscribed by the state statute, the defendant, who had been charged with displaying a red flag for all three proscribed purposes, was deemed to have made an objection in the trial court that related to the validity "not merely of the statute taken as a whole, but

absence of objection, we have consistently held that the defendant has waived the defect in one basis of a count and that the existence of a valid alternative basis for conviction warrants affirmance. *United States v. Cunningham,* 723 F.2d 217 (2d Cir.1983); *United States v. Mowad,* 641 F.2d 1067 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981); *United States v. Dixon,* 536 F.2d 1388 (2d Cir.1976); *United States v. Bonacorsa,* 528 F.2d 1218 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Natelli,* 527 F.2d 311 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *United States v. Goldstein,* 168 F.2d 666 (2d Cir.1948); *United States v. Mascuch,* 111 F.2d 602 (2d Cir.), *cert. denied,* 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416 (1940). The majority distinguishes this line of authority on the ground that in each case the reason that one alternative basis for conviction was invalid was insufficiency of evidence. For lack of evidence, one of several specifications of perjury was sought to be challenged for the first time on appeal in *Cunningham, Bonacorsa, Natelli, Goldstein,* and *Mascuch,* and one of several objectives of a conspiracy was challenged in *Dixon* and *Mowad.* At most, the majority's distinction requires us now to consider whether the legal deficiency of an alternative basis for a conviction is waivable in the same manner as an evidentiary deficiency. The fact that our prior cases have found waiver when the deficiency was evidentiary is no reason to rule against waiver in this case where the deficiency is one of law.

Confronting the issue, I see no valid argument against waiver. One of several alternative bases for conviction is just as invalid whether the deficiency is lack of evidence or lack of criminality under the pertinent statute. When the defect is lack of evidence, we subject the defendant to the risk that the jury may have rested its decision solely on the invalid basis, for example, a specification of a perjury charge.

We do not permit the defendant to withhold his objection until appeal. We assume that the trial judge would have withdrawn the invalid basis from the jury's consideration if asked to do so, and we further assume, in the absence of objection, that the conviction adequately rests on the valid bases. The same reasoning should apply here where the invalid basis arises because one of several RICO predicate acts is not within the statutory definition of "racketeering activity." Of course we would notice as plain error a defect in an indictment arising from the omission of a significant aspect of the offense alleged, if the omitted aspect had not been framed for jury consideration by the instructions. That rule underlies our reversal of Tomasulo's conviction on Count One, because the invalidity of one of the predicate acts he is alleged to have committed leaves only one other predicate act charged to him; he has therefore been convicted without an allegation or proof of having committed two valid predicate acts. But Santora was alleged in Count One to have committed seven valid predicate acts, and the evidence sufficed to permit his conviction. There is simply no reason to permit him to raise for the first time on appeal the invalidity of one predicate act when any two of the remaining seven support his conviction.

Even if the waiver rule of *Dixon* and *Natelli* should not generally be applied unless the defect in an alternative basis for conviction is insufficiency of evidence, there are compelling circumstances warranting a finding of waiver in this case. The only plausible argument against waiver, possibly valid in some cases, is that there might be too great a risk that the jury would not have convicted on the valid basis if the invalid basis had been objected to and withdrawn from the jury's consideration. That risk is illusory in this case. It is totally unrealistic to think that the jury that convicted Santora on Count One after hearing evidence against him involving the seven

of each one of the three clauses separately relied upon by the State in order to obtain a

conviction." 283 U.S. at 365, 51 S.Ct. at 534.

valid predicate acts charged in that count— four murder conspiracies, two drug conspiracies, and one robbery conspiracy—would have hesitated even momentarily in reaching a guilty verdict had they not been permitted to consider the eighth predicate act—conspiracy to violate the federal gambling statute.

Furthermore, the jury convicted Santora on Count Two, which charged a substantive RICO violation, 18 U.S.C. § 1962(c) (1982). That verdict demonstrates that the jury found beyond a reasonable doubt that Santora had committed at least two of the eight predicate acts alleged in that count, none of which is deficient in any respect. The majority rejects the Government's argument that the jury's finding of at least two predicate acts under Count Two may be enlisted to support the conviction on Count One. To do so, the majority contends, permits the Government to violate traditional rules of pleading that require a conviction on any one count to be based only on the allegations set forth in that count. But the issue here is not whether the Government is entitled to some extra benefit that may be in violation of rules of pleading; rather, the issue is whether the defendant should be relieved of the consequences of his own failure to object to the legal invalidity of one of the eight predicate acts alleged in Count One. The jury's guilty verdict on Count Two, necessarily finding that Santora committed at least two acts of racketeering, eliminates entirely any risk that the jury would not have convicted him on Count One if predicate act 5m had been withdrawn.

I therefore dissent from the reversal of Santora's conviction on Count One. In all other respects, I concur in the Court's opinion.